**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00425 (CRC)** |
| **v.** | : | |
| | : | |
| **KENE B. LAZO,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Kene B. Lazo to 90 days' incarceration, 36 months' probation, 60 hours of community service, and $500 restitution.

### I.      Introduction

The defendant, Kene B. Lazo ("Lazo"), participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than $2.7 million dollars in losses.[1]

On February 1, 2022, Lazo pleaded guilty to one count of violating 40 U.S.C.

§ 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building. As explained

---

[1] As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol exceeded $2.7 million dollars. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

herein, a sentence of 90 days' incarceration is appropriate in this case because: (1) on or about and between January 3 and January 7, 2021, Lazo posted multiple statements on his Facebook social media account announcing his intent to travel to Washington, D.C. to protest the election results; he posted photos of himself posing in the outfit he intended to wear—he wore a half-face German style helmet, orange-tinted goggles, an inverted American flag face covering, and an American flag cape, he carried a Captain America-style shield affixed to a small wooden-handled broom, and he wore what appeared to be a black tactical vest and body armor that covered his arms from hands to elbows; (2) on January 6, Lazo entered the U.S. Capitol at approximately 2:34 p.m. EST through the Upper West Terrace doors. which had been breached only one minute prior to Lazo's entry, making Lazo among the first group that accessed the Capitol via this breach point; (3) though he did not personally engage in violence or property destruction, he announced to a social media contact that he would be armed with pepper spray and a baton; (4) in videos posted to his Facebook account, Lazo can be heard chanting "Our House" and joining rioters in other chants; (5) Lazo did not merely enter and leave, as described in more detail below, he remained in the U.S. Capitol, traveling extensively throughout the Senate side of the building, entering the Senate Gallery a particularly sensitive space given its physical proximity to the certification proceedings; (6) Lazo not only deleted his primary Facebook account within a few days of the Capitol Riot, but admitted to agents that he disposed of his clothing and gear shortly after returning home from Washington, D.C.; and (7) while released on his own recognizance and under pretrial supervision in this case, Lazo was charged with a domestic violence offense in Norfolk, VA and sentenced to a period of incarceration.

The Court must also consider that Lazo's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to

overwhelm police officers, breach the Capitol, and disrupt the proceedings.  But for his actions alongside so many others, the riot likely would have failed to delay the certification vote.  Lazo's participation in the riot with thousands of others succeeded in halting the Congressional certification of the Electoral College vote.  Lazo celebrated his involvement and complained that their collective efforts were ultimately ineffective in stopping the certification.  These factors render the recommended sentence both necessary and appropriate in this case.

## II.    Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 16 (Statement of Offense), at 1-7.  In doing so, however, the government in no way intends or wishes to deemphasize the importance of acknowledging that each participant in a riot is part of that riot.  As Judge Chutkan recognized, "A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers." *United States v. Matthew Mazzocco*, 21-CR-54 (TSC), ECF No. 32, p. 25. Judge Lamberth similarly wrote,

> Some of the rioters—now defendants in criminal cases—directly contributed to this violence by assaulting members of law enforcement or by planning, preparing, and facilitating this violence. Others, like Little here, did not directly assault officers. But even Little and those who engaged in this "lesser" criminal conduct were an essential component to the harm. Law-enforcement officers were overwhelmed by the sheer swath of criminality. And those who engaged in violence that day were able to do so because they found safety in numbers.

*United States v. James Leslie Little*, 21-CR-315 (RCL), ECF No. 43, p. 2. From the most mundane actions to the most violent, each rioter, including Lazo, contributed directly and indirectly to the violence and destruction of that day.

*Lazo's Role in the January 6, 2021 Attack on the Capitol*

Lazo described in social media posts his plan to attend the protest in Washington, D.C. on January 6, 2021. On January 3 and 4, 2021, he had the following exchange on his Facebook account with another user ("Contact 1"):

> Lazo: "all is good uncle..i will be going ro [sic] washington DC to protest on jan6."
> Contact 1: "Ok Brian fine. Give my regards to Jen and your kids."

On January 4, 2021, Lazo had the following exchange on his Facebook account with another user ("Contact 2"):

> Contact 2: "You look like Superman Brian..stay safe and healthy always."
> Lazo: "will be the only 1 with a boi boi representing asians [sic]."[2]

In a separate post, on January 5, 2021, Lazo posted multiple photos of himself in the outfit and accessories he planned to wear on January 6, a makeshift battle dress uniform, signaling that he was prepared for conflict, as depicted in Images 1 and 2.

Images 1-2

 

---

[2] Lazo later posted, "i took a boi boi to the Capitol and swept the floor literally." Based on its investigation, the government has concluded that a "boi boi" refers to a Walis Tambo broom, commonly used in the Philippines, and depicted herein in Images 1, 4, 5, 8, 11, 12, and 14.

In response to these posts, one user suggested Lazo wear a blade in his boot, and Lazo responded that it would be illegal and that instead he would be carrying an "asian [sic] coconut broom, 1m baton, and pepper spray…"  Lazo also commented, "if shit hits the fan i will get some dead guys gear and guns if it comes down to it."

Image 3 (Facebook search warrant return)

**Author** Fam Council (Facebook: 100052459713527)
**Sent** 2021-01-04 21:54:31 UTC
**Body** well thats illegal.. i have asian coconut broom and a 1m baton

**Author** Fam Council (Facebook: 100052459713527)
**Sent** 2021-01-04 21:54:47 UTC
**Body** and pepper sprays and bullhorns

**Author** Elle Rich (Facebook: 100000375652157)
**Sent** 2021-01-04 21:56:26 UTC
**Body** Nice… like it… your body gear is goo u should eear bullet proof as well

**Author** Elle Rich (Facebook: 100000375652157)
**Sent** 2021-01-04 21:57:02 UTC
**Body** So whats the broom for

**Author** Fam Council (Facebook: 100052459713527)
**Sent** 2021-01-04 21:57:45 UTC
**Body** if shit hits the fan i will get some dead guys gear and guns if it comes down to it..

Lazo was featured in at least one open-source photo holding his "coconut broom" above his head inside the Rotunda, as depicted in Image 4.

Image 4



At approximately 2:34 p.m. EST on January 6, Lazo entered the Capitol through the Upper West Terrace doors without permission.  After entering, Lazo walked up a flight of stairs to the second floor, he spent approximately four minutes inside the Rotunda before moving into the Rotunda Door Interior where he remained for approximately one minute.  At approximately 2:43 p.m. EST, Lazo was observed on the third floor in the East Corridor near S306 walking down the hallway toward the Senate Gallery.  Lazo was observed in the Senate Gallery for approximately three minutes before heading back to the second floor.  At approximately 2:40 p.m. EST, he was observed in the hall by S208 moving toward the Ohio Clock Corridor.  Lazo briefly headed west toward Room 224, double-backed to the East Front Corridor near S206, and at approximately 2:52 p.m. EST he reentered the Rotunda Door Interior.  Lazo briefly walked back into the Rotunda for less than a minute before heading back into the Rotunda Door Interior and exiting through the Rotunda Doors at approximately 2:53 p.m. EST.  Lazo's movements throughout the Capitol are depicted in the following images:

Image 5 (Lazo identified with a red arrow)



The Upper West Terrace doors had been breached at 2:33 p.m. EST.  Thus, it appears that Lazo was among the first 20 rioters that entered the U.S. Capitol through this breach point.[3]

As captured by screenshots from surveillance cameras, Lazo (in the red box) made his way to the Rotunda.

Images 6-7



---

[3] Assaults against law enforcement on the West Front of the Capitol Grounds made the rioters' entry into the United States Capitol Building on January 6, 2021, possible.  Initiated by the most fervent smaller groups and individuals within the crowd and using the mob itself as a cloak for their actions, each blow helped the crowd penetrate further into the United States Capitol Police's ("USCP") defenses until the building itself was accessible and the occupants were at risk.  The physical breaches of the building can therefore be traced directly back to the assaultive conduct on the grounds of the West Front.



As further captured by screenshots from surveillance cameras, Lazo (indicated by the red boxes) then wandered throughout various areas of the U.S. Capitol.

Images 8-17



Rotunda Door Interior (second floor) – appx 2:40 p.m. EST



East Corridor near S306 (third floor) – appx 2:43 p.m. EST[4]



Senate Gallery SE Near S309 (third floor) – appx 2:43 p.m. EST

---

[4] The office spaces depicted in Image 8 above ("East Corridor near S306") were accessed by a limited number of rioters.



Senate Gallery East near S312 (third floor) – appx 2:46 p.m. EST



S309 (third floor) – appx 2:47 p.m. EST



Hall by S208 (second floor) – appx 2:48 p.m. EST



Ohio Clock Corridor near S208 (second floor) – appx 2:48 p.m. EST



Near Room 224 (second floor) – appx 2:50 p.m. EST



East Front Corridor (second floor) – appx 2:51 p.m. EST



Rotunda Door Interior (second floor – appx 2:52 p.m. EST

Lazo (in the red box) exited the Capitol through the East Rotunda doors at approximately

2:53 p.m. EST.

Images 18-19



Rotunda Door Interior (second floor) – appx 2:53 p.m. EST



Rotunda Door Interior (second floor) – appx 2:53 p.m. EST

Lazo spent approximately 20 minutes inside of the Capitol before exiting.

He later attempted to cover up evidence of his involvement by deleting his Facebook account and disposing of his clothing and gear shortly after attending the riot.[5]  On June 2, 2021, he told agents that his wife made him get rid of all the stuff he had and was wearing that day including his phone.  According to Lazo, everything had been thrown away.[6]

---

[5] Lazo was initially developed as a suspect via a public tip submitted through the FBI online portal.  Tipster reported, "This guy who was carrying a broom posted several photos from his Facebook account called Fam Council, which has since been deleted."  Though the Facebook account "Fam Council" was deleted shortly after January 6, the FBI obtained Facebook records through a search warrant.

[6] Jen Lazo, Lazo's wife, was interviewed by agents on June 3, 2021, and stated that after learning that her husband was present at the U.S. Capitol on January 6, 2021, she told him to get rid of everything he took with him.  According to Lazo's wife, the clothing, baton, and pepper spray were thrown into a dumpster one or two days later.

*Lazo's Social Media Posts*

Lazo took photographs of himself throughout the day on January 6 and posted them to his Facebook account.  In videos that he posted, Lazo can be heard chanting "Our House", "Four More Years", and "U.S.A.".  Exhibits A-D (Videos from "Fam Council" Facebook account, attributed to Lazo, and recovered pursuant to a judicially authorized search warrant). Image 20 is a photo Lazo posted to his Facebook account while inside the U.S. Capitol, and the comments depicted in Image 21 accompanied the photo post:

Images 20-21



Lazo continued to post about his activities on January 6 in the days afterwards. On January 7, 2021, Lazo had the following exchange on his Facebook account with another user ("Contact 3"):

> Contact 3: "How does it feel being there protesting at the White House Brian? Are you still there right now?"
> Lazo: "they still stole it even tho [sic] there [sic] cheating..it was humbling."

*The Charges and Plea Agreement*

On May 26, 2021, Lazo was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1), 641, and 40 U.S.C. §§ 5104(e)(2). On May 28, 2021, following his arrest, Lazo appeared in the

district court in the Eastern District of Virginia.  On June 23, 2021, Lazo was charged in a four-count Information with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On March 8, 2022, he pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building. By plea agreement, Lazo agreed to pay $500 in restitution to the Architect of the Capitol.

### III.    Statutory Penalties

Lazo now faces a sentencing for violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, he faces up to six months of imprisonment, a fine of not more than $5,000, and a $10 special assessment.  He must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).  As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of 90 days' incarceration, 36 months' probation, 60 hours of community service, and $500 restitution.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the only time in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while looking at a defendant's individual conduct, this Court, in determining a fair and just sentence on this spectrum, should look to a spectrum of aggravating and mitigating factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated  sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had Lazo personally engaged in violence or destruction, he would be facing additional charges and/or penalties associated with that conduct.  The absence of violent or destructive acts on his part is therefore not a mitigating factor in misdemeanor cases, nor does it meaningfully distinguish Lazo from most other misdemeanor defendants.

Lazo anticipated what would happen in Washington, D.C. and wanted to be there to protest the election results and "represent[] asians [sic]."  He was clearly prepared for violence, as indicated by his statements on social media before the attack; he dressed in military gear and brought various items to use as weapons, to wit: a "coconut broom", shield, baton, and pepper spray.  He wore an outfit that concealed his entire face, likely because he anticipated such entry was illegal.

Lazo was among the first to enter through the breach at the Upper West Terrace doors and traveled extensively to various areas throughout the Capitol, including the highly sensitive Senate Gallery in close physical proximity to the certification proceedings.  Lazo chanted with the mob outside and inside the Capitol and posted photographs and videos to Facebook.

Lazo attempted to cover up evidence of his involvement by deleting his Facebook account and disposing of his clothing and gear shortly after the riot.  Moreover, after being in the Capitol, he continued to express pride in his conduct in social media posts, bragging that he was there, posting a photo of himself inside the Rotunda and complaining to others, "they still stole it even tho [sic] there [sic] cheating..it was humbling."

While Lazo quickly accepted responsibility for his conduct, this Court should assess the defendant's expressions of remorse.  As several other sentencing proceedings for these defendants have shown, the expression of remorse can be an unreliable watermark in January 6 cases. As Judge Chutkan explained:

> And I take into account the government's statement and [defense counsel]'s statement that he accepted early responsibility. But [the defendant's] remorse—and I believe his remorse is sincere—[the defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.

*United States v. Matthew Carl Mazzocco*, 21-CR-54 (TSC), ECF No. 32, pp. 29-30. Judge

Lamberth expressed even more skeptical views:

> The Court often finds it difficult to ascertain the sincerity of these particular defendants' remorse. Many defendants appear sincere at sentencing, boasting of their purportedly deep shame, regret, and desire to change and be law-abiding citizens. But this Court is all too familiar with crocodile tears. Indeed, one day after being sentenced to probation, another January 6 defendant made statements in an interview that directly conflicted with the contrite statements that she made to the undersigned.

*United States v. James Leslie Little*, 21-CR-315 (RCL), ECF No. 43, pp. 3-4.

Lazo makes a single expression of remorse documented in his presentence investigation where he apologies for his conduct. PSR ¶ 21.  Accordingly, the nature and the circumstances of this offense render the government's recommended sentence of 90 days' incarceration, 36 months' probation, 60 hours of community service, and $500 restitution sufficient but not greater than necessary to reflect the seriousness of the instant offense, to promote deterrence, to protect the public from future crimes that may be committed by Lazo, and to avoid unwarranted disparity.

## B.  Lazo's History and Characteristics

As set forth in the Presentence Investigation Report ("PSR"), Lazo is a 43-year-old man. PSR ¶ 36.  From 2012 to May 2021, Lazo owned and operated RodBustars, LLC, a company that installed reinforcing steel in commercial and industrial building projects, but he has been virtually unemployed since his arrest in Norfolk, VA on May 28, 2021.  PSR ¶¶ 64-65.

Lazo's criminal history includes two misdemeanor convictions.  In 2013, he pled guilty to driving while intoxicated and was sentenced to 12 months suspended, 1-year unsupervised probation, and a 12-month license suspension. PSR ¶ 26.  In 1999, he pleaded guilty to disturbing the peace; due to the age of the case, court documents were not available. PSR ¶ 25.

On August 23, 2021, he was arrested and charged in the Juvenile & Domestic Relations Court in Norfolk, Virginia with various offenses against his wife and daughter.  He was held without bond in that jurisdiction until his conviction and sentencing on November 1, 2021. PSR ¶ 8.  According to the arrest report, on August 23, 2021, Lazo's wife reported that Lazo physically threatened her during a verbal altercation.  Lazo later came to her workplace and began berating her in front of her colleagues.  Fearing for her safety and the safety of her children, Lazo's wife called police.  When police arrived at the residence, Lazo's daughter reported that Lazo had verbally, sexually, and physically assaulted her.[7]  Lazo was located by patrol officers and arrested. An emergency protective order was issued against Lazo on August 24, 2021.  PSR ¶ 27.

According to records, on November 1, 2021, Lazo pleaded guilty to two violations of Va. Code § 18.2-57.2 (Assault and battery against a family or household member) and was sentenced to twelve months on each charge, with eleven months suspended on each.  As a condition of his sentence, Lazo was required to complete a batterer intervention program, substance abuse assessment and treatment, parenting class, and submit to a mental health assessment and treatment.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

---

[7] Lazo's daughter also reported that on August 22, 2021, Lazo slapped her and struck her in the chest with a closed-fist. She also told police that during the summer of 2020, the defendant put his hand under her shirt and started fondling her breasts.

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[8] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.  Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes

---

[8] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

we have: the peaceful transfer of power to a newly elected President.  As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70.  Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 24 ("What happened on that day was nothing less than the attempt of a violent mob to prevent the orderly and peaceful certification of an election as part of the transition of power from one administration to the next, something that has happened with regularity over the history of this country. That mob was trying to overthrow the government.") (statement of Judge Chutkan).

The gravity of these offenses demands deterrence.  This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss).  And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Lazo's actions – before, during and after the riot – demonstrate the need for specific deterrence.  Lazo attempted to cover up his wrongdoing immediately after returning home from

Washington, D.C. by deleting his Facebook account and disposing of his clothing and gear.  He also celebrated the Capitol siege both on January 6 and afterwards, and his only expression of remorse is "I was wrong for my behavior.  I'm sorry and I am finding ways to better myself through programs and church.".  PSR ¶ 21.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[9] Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment.  The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not necessarily become the default.[10] *See United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19 ("I don't want to create the impression that probation is the automatic outcome here because it's not going to be.") (statement of Judge

---

[9] Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[10]  Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

Lamberth); *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

The government and the sentencing courts have made meaningful distinctions between offenders.  Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment.  Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

Lazo has pleaded guilty to Count Four of the Information, charging him with parading, demonstrating, and picketing in a Capitol Building, a violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A.  § 3553(6), do apply, however.

For one thing, although the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long he remained inside, the nature of any statements he made (on social media or otherwise), whether he destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences.  And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other

relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement.  *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court may also consider the sentences imposed in similar misdemeanor cases involving preparations for violence, the use of social media to promote and celebrate the riot, entry through the Upper West Terrace shortly after the initial breach, the destruction of evidence, and the intervening conviction for a crime of domestic violence.

Verden Andrew Nalley pleaded guilty to one count of violating 18 U.S.C. § 1752(a)(1), Entering or Remaining in a Restricted Building or Grounds, a Class A misdemeanor. Nalley entered the Capitol on January 6 and walked around for 30 to 40 minutes.  After January 6, his social media posts revealed a lack of remorse for his actions.  He actively spread false information,

downplaying the violence that occurred on January 6 and threatened to "be back with guns in two weeks if [the election results were] not fixed."  The government requested a sentence of 14 days imprisonment and 36 months' probation.  Judge Friedrich imposed a sentence of 24 months' probation.  21-cr-00116 (DLF)

David Mish pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G).  Mish entered the Capitol from one of the west front breach points at approximately 2:40 p.m. EST and remained inside the building for more than 30 minutes.  The government had no evidence that Mish personally engaged in any violence or destruction of property or incited others to do so; nor that he destroyed evidence after the riot; nor that he wrote anything with respect to the riot on social media.  Further, Mish was not known to have entered any particularly sensitive areas of the Capitol. However, Mish recorded a video on his cell phone while inside the Capitol in which he is heard downplaying the level of violence, stating, "The violence that they're talking about? Oh cut it out. There was three windows. You better knock it off. You come to Kenosha, Wisconsin and I'll show you violence. That went down."  Notably, Mish had an extensive criminal history (largely non-violent, misdemeanor offenses) dating from 1998-2012 which the government argued "demonstrate[d] a longstanding lack of respect for the law."  Judge Nichols agreed and imposed the government's requested sentence of 30 days' incarceration.  21-cr-00112 (CJN).

James Bonet pleaded guilty to one count of 18 U.S.C. § 1752(a)(1).  Bonet was actively posting to social media after arriving at the Capitol grounds and entering the restricted area; he filmed a small group of law enforcement officers, outnumbered by the mob and standing at the top of a staircase leading to the Capitol Building, which he captioned "scumbags" in the post; as officers deployed riot control munitions, Bonet called them "pieces of shit" and yelled that they were "shooting" at "innocent protestors."  Bonet entered the U.S. Capitol at 3:09 p.m. EST.  Bonet

26

entered S-140, the hideaway office of Senator Jeff Merkley of Oregon, where he smoked a marijuana cigarette.  The government recommended a sentence of 45 days' incarceration and 12 months' probation.  Judge Sullivan sentenced the defendant to 90 days' incarceration and 12 months' supervised probation.  (21-cr-00121 (EGS).

As this Court is aware, Jennifer ("Jenna") Ryan pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G).  Ryan was extremely active on social media on her approach and during her entry into the U.S. Capitol on January 6, 2021.  She posted a video on her Facebook account stating, "We're gonna go down and storm the capitol.  They're down there right now and that's why we came and so that's what we are going to do.  So wish me luck."  Ryan posted many statements about fighting on the way to the Capitol, posted photos of herself smiling after leaving the Capitol, gave TV interviews, and made statements that it was the proudest day of her life.  She also later posted that she would not go to jail because she is "white and has blonde hair."  This Court agreed with the government's recommended sentence of 60 days' incarceration and sentenced Ryan accordingly. 21-cr-00050 (CRC)

James Little pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G).  Prior to January 6, Little uploaded a video titled, "We Won't Beat Them Next Time! There Won't Be A Next Time! It's Now Or Never!" to a YouTube channel he maintained. In that video, Little threatened civil war and gun violence against political opponents of the former President if the Supreme Court did not intervene on the former President's behalf. On January 6, Little entered the Capitol, went to the Senate Gallery, celebrated being there with other rioters, and sent a text boasting about being in the Capitol.  On January 13, 2021, he again referenced the commencement of a civil war. Judge Lamberth imposed a sentence of 60 days' imprisonment and 36 months' probation. 21-cr-00315 (RCL).

In this case, the government submits that a sentence of 90 days' imprisonment would not create an "unwarranted disparity" with the sentences imposed in those cases because of the aggravating factors in this case.  Lazo anticipated and prepared for violence on January 6, dressing in military gear and bringing weapons (including a baton and pepper spray); he was among the first to enter the Capitol through the breached Upper West Terrace Doors; he travelled extensively to various areas throughout the Capitol including sensitive areas such as office spaces and the Senate Gallery; he chanted with the mob inside and posted photographs and videos to Facebook; he continued to express pride in his conduct in social media posts afterwards; he attempted to cover up evidence of his involvement by deleting his Facebook account and disposing of his (distinctive) clothing and gear; and to this day he has expressed little remorse for his conduct on January 6, providing a written statement to the Department of Probation, "I was wrong for my behavior. I'm sorry and I am finding ways to better myself through programs and church.".  PSR ¶ 21.  While Lazo's case most closely tracks to the Little case discussed above, it bears one notable distinction: this defendant, while released on personal recognizance and subject to standard conditions of release, *i.e.*, "no local/state/federal crimes", was charged with a crime of domestic violence in Norfolk, VA, later convicted, and sentenced to a period of incarceration.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v.*

*Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.      The Court's Lawful Authority to Impose a Split Sentence

A sentencing court may impose a "split sentence"—"a period of incarceration followed by period of probation," *Foster v. Wainwright*, 820 F. Supp. 2d 36, 37 n.2 (D.D.C. 2011) (citation omitted)—for a defendant convicted of a federal petty offense.  *See* 18 U.S.C. § 3561(a)(3); *see United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that " a split sentence is permissible under law and warranted by the circumstances of this case); *United States v. Smith*, 21-cr-290 (RBW), ECF 43 (D.D.C. Mar. 15, 2022) (imposing split sentence); *United States v. Meteer*, 21-cr-630 (CJN), ECF 37 (D.D.C. April 22, 2022) (imposing split sentence); *United States v. Sarko*, 21-cr-591 (CKK), ECF 37 (D.D.C. April 29, 2022) (imposing split sentence); *United States v. Entrekin*, 21-cr-686 (FYP), ECF 34 (D.D.C. May 6, 2022) (imposing split sentence); *United States v. Hemphill*, 21-cr-555 (RCL), ECF 40 (D.D.C. May 24, 2022) (imposing split sentence); *United States v. Buhler*, 21-cr-510 (CKK), ECF 39 (D.D.C. June 1, 2022) (imposing split sentence); *United States v. Caplinger*, 21-cr-342 (PLF), ECF 65 (D.D.C. June 7, 2022) (opinion concluding that split sentence is permissible). In addition, for any defendant placed on probation, a sentencing court may impose incarceration for a brief interval as a condition of probation under 18 U.S.C. § 3563(b)(10).

### A.   A sentence imposed for a petty offense may include both incarceration and probation.

#### 1.  *Relevant Background*

In 1984, Congress enacted the Sentencing Reform Act, which in substantial part remains the sentencing regime that exists today.  *See* Pub. L. No. 98–473, §§211-212, 98 Stat 1837 (1984), *codified at* 18 U.S.C. § 3551 *et seq.*; *see Mistretta v. United States*, 488 U.S. 361, 365-66 (1989) (noting that the Sentencing Reform Act of 1984 wrought "sweeping changes" to federal criminal sentencing).  That legislation falls in Chapter 227 of Title 18, which covers "Sentences."  Chapter 227, in turn, consists of subchapter A ("General Provisions"), subchapter B ("Probation"), subchapter C ("Fines"), and subchapter D ("Imprisonment).  Two provisions—one from subchapter A and one from subchapter B—are relevant to the question of whether a sentencing court may impose a term of continuous incarceration that exceeds two weeks[11] followed by a term of probation.

First, in subchapter A, 18 U.S.C. § 3551 sets out "[a]uthorized sentences."  Section 3551(a) makes clear that a "defendant who has been found guilty of" any federal offense "shall be sentenced in accordance with the provisions of" Chapter 227 "[e]xcept as otherwise specifically provided."  18 U.S.C. § 3551(a).  Section 3551(b) provides that a federal defendant shall be sentenced to "(1) a term of probation as authorized by subchapter B; (2) a fine as authorized by subchapter C; or (3) a term of imprisonment as authorized by subchapter D."  18 U.S.C. § 3551(b).[12]  As a general matter, therefore, "a judge must sentence a federal offender to either a fine, a term of probation, or a term of imprisonment."  *United States v. Kopp*, 922 F.3d 337, 340 (7th Cir. 2019).

---

[11] A period of incarceration that does not exceed two weeks followed by a term of probation is also permissible under 18 U.S.C. § 3563(b)(10).  *See* Part II *infra*.

[12] Section 3551(b) further provides that a sentencing judge may impose a fine "in addition to any other sentence."  18 U.S.C. § 3551(b).

Second, 18 U.S.C. § 3561, the first provision in subchapter B, addresses a "[s]entence of probation."  As initially enacted, Section 3561 provided that a federal defendant may be sentenced to a term of probation "unless . . . (1) the offense is a Class A or Class B felony and the defendant is an individual; (2) the offense is an offense for which probation has been expressly precluded; or (3) the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense."  Pub. L. No. 98-473, at § 212; *see United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992) (noting that the Sentencing Reform Act did not permit "a period of 'straight' imprisonment . . . at the same time as a sentence of probation").

Congress, however, subsequently amended Section 3561(a)(3).  In 1991, Congress considered adding the following sentence to the end of Section 3561(a)(3): "However, this paragraph does not preclude the imposition of a sentence to a term of probation for a petty offense if the defendant has been sentenced to a term of imprisonment at the same time for another such offense."  H.R. Rep. 102-405, at 167 (1991).  Instead, three years later Congress revised Section 3561(a)(3) by appending the phrase "that is not a petty offense" to the end of the then-existing language.  *See* H.R. Rep. No. 103-711, at 887 (1994) (Conference Report).  In its current form, therefore, Section 3561(a)(3) provides that a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).

### 2.  Analysis

Before Congress passed the Sentencing Reform Act of 1984, sentencing courts could impose a split sentence on a federal defendant in certain cases.  *See United States v. Cohen*, 617 F.2d 56, 59 (4th Cir. 1980) (noting that a sentencing statute enacted in 1958 had as its "primary purpose . . . to enable a judge to impose a short sentence, not exceeding sixth months, followed by

probation on a one count indictment"); *see also United States v. Entrekin*, 675 F.2d 759, 760-61 (5th Cir. 1982) (affirming a split sentence of six months' incarceration followed by three years of probation).  In passing the Sentencing Reform Act, Congress sought generally to abolish the practice of splitting a sentence between imprisonment and probation because "the same result" could be accomplished through a "more direct and logically consistent route," namely the use of supervised release as set out in 18 U.S.C. §§ 3581 and 3583.  S. Rep. No. 225, 1983 WL 25404, at *89; *accord* United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") § 5B1.1, Background.  But Congress's 1994 amendment to Section 3561(a)(3) reinstated a sentencing court's authority to impose a split sentence for a petty offense.

Under 18 U.S.C. § 3561, a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).  Thus, for any federal offense *other than* a petty offense, Section 3561(a)(3) prohibits "imposition of both probation and straight imprisonment," consistent with the general rule in Section 3551(b).  *United States v. Forbes*, 172 F.3d 675, 676 (9th Cir. 1999); *see United States v. Martin*, 363 F.3d 25, 31 (1st Cir. 2004); *United States v. Harris*, 611 F. App'x 480, 481 (9th Cir. 2015); *Anderson*, 787 F. Supp. at 539.

But the statutory text of 18 U.S.C. § 3561(a)(3) goes further by permitting a court to sentence a defendant to a term of probation "unless" that defendant "is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).  Section 3561 "begins with a grant of authority"—permitting a court to impose probation—followed by a limitation in the words following "unless."  *Little*, 2022 WL 768685, at *4.  But that limitation "does not extend" to a defendant sentenced to a petty offense.

*See id.* ("[W]hile a defendant's sentence of a term of imprisonment *may* affect a court's ability to impose probation, the petty-offense clause limits this exception.").

It follows that when a defendant *is* sentenced for a petty offense, that defendant may be sentenced to a period of continuous incarceration and a term of probation. *See United States v. Posley*, 351 F. App'x 807, 809 (4th Cir. 2009) (per curiam). In *Posley*, the defendant, convicted of a petty offense, was sentenced to two years of probation with the first six months in prison. *Id.* at 808. In affirming that sentence, the Fourth Circuit concluded that Section 3561(a)(3) "[u]nquestionably" provided statutory authority to sentence the petty-offense defendant to "a term of six months of continuous imprisonment plus probation." *Id.* at 809; *see* Cyclopedia of Federal Procedure, § 50:203, *Capacity of court to impose probationary sentence on defendant in conjunction with other sentence that imposes term of imprisonment* (3d ed. 2021) ("[W]here the defendant is being sentenced for a petty offense, a trial court may properly sentence such individual to a term of continuous imprisonment for a period of time, as well as a sentence of probation.") (citing *Posley*); *see also* Wright and Miller, *Federal Practice and Procedure*, § 547, at n.13 (4th ed. 2021) ("A defendant may be sentenced to probation unless he . . . is sentenced at the same time to imprisonment for an offense *that is not petty*.") (emphasis added).

Nor does the phrase "that is not a petty offense" in Section 3561(a)(3) modify only "different offense." *See Little*, 2022 WL 768685, at *5-*6 (concluding that "same" in Section 3561(a)(3) functions as an adjective that modifies "offense"). Section 3561(a)(3) does not state "the same *offense* or a different offense that is not a petty offense," which would imply that the final modifier—*i.e.*, "that is not a petty offense"—applies only to "different offense." The phrase "that is not a petty offense" is a postpositive modifier best read to apply to the entire, integrated phrase "the same or a different offense." *See* Antonin Scalia & Bryan A. Garner, *Reading Law:*

*The Interpretation of Legal Texts* 148 (2012).  Had Congress sought to apply the phrase "not a petty offense" solely to "different offense," the "typical way in which syntax would suggest no carryover modification" would be some language that "cut[s] off the modifying phrase so its backward reach is limited."  *Id.* at 148-49.  And while the indefinite article "a" might play that role in other contexts (*e.g.*, "either a pastry or cake with icing" vs. "either a pastry or a cake with icing"), the indefinite article in Section 3561(a)(3) merely reflects the fact that the definite article before "same" could not naturally apply to the undefined "different offense."  *See Little*, 2022 WL 768685, at *6 (identifying other statutes and "legal contexts" with the identical phrase that carry the same interpretation).

Permitting a combined sentence of continuous incarceration and probation for petty offenses is sensible because sentencing courts cannot impose supervised release on petty-offense defendants.  *See* 18 U.S.C. § 3583(b)(3); *United States v. Jourdain*, 26 F.3d 127, 1994 WL 209914, at *1 (8th Cir. 1994) (unpublished) (plain error to impose a term of supervised release for a petty offense).  When Congress in 1994 amended the language in Section 3561(a), it again provided sentencing courts with "latitude," *see* S. Rep. 98-225, 1983 WL 25404, at *89, to ensure some degree of supervision—through probation—following incarceration.

Section 3551(b)'s general rule that a sentencing court may impose either imprisonment or probation (but not both) does not preclude a sentencing court from imposing a split sentence under Section 3561(a)(3) for a petty offense for two related reasons.

First, the more specific permission for split sentences in petty offense cases in Section 3561(a)(3) prevails over the general prohibition on split sentences in Section 3551(b).  *See Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one.").  As noted above, when Congress

enacted the general prohibition on split sentences in Section 3551(b), it had not yet enacted the more specific carveout for split sentences in petty offense cases in Section 3561(a)(3). That carveout does not "void" the general prohibition on split sentences in Section 3551(b); rather, Section 3551(b)'s general prohibition's "application to cases covered by the specific provision [in Section 3651(a)(3)] is suspended" as to petty offense cases. Scalia & Garner, *supra*, at 184. In other words, Section 3551(b)'s prohibition against split sentences "govern[s] all other cases" apart from a case involving a petty offense. *Id.* This interpretation, moreover, "ensures that *all* of Congress's goals set forth in the text are implemented." *Little*, 2022 WL 768685, at *8.

Second, to the extent Section 3551(b)'s general prohibition against split sentences conflicts with Section 3561(a)(3)'s permission for split sentences in petty offense cases, the latter, later-enacted provision controls. *See Posadas v. Nat'l Bank of N.Y.*, 296 U.S. 497, 503 (1936) ("Where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one."); Scalia & Garner, *supra*, at 327-329. Where a conflict exists "between a general provision and a specific one, whichever was enacted later might be thought to prevail." *Id.* at 185. "The "specific provision"—here Section 3561(a)(3)—"does not negate the general one entirely, but only in its application to the situation that the specific provision covers." *Id.* Section 3551(b)'s general prohibition does not operate against the more specific, later-enacted carveout for split sentences in Section 3561(a)(3).

An interpretation of Sections 3551(b) and 3561(a) that a sentencing court "must choose between probation and imprisonment when imposing a sentence for a petty offense," *United States v. Spencer*, No. 21-cr-147 (CKK), Doc. 70, at 5 (Jan. 19, 2022), fails to accord the phrase "that is not a petty offense" in Section 3561(a)(3) any meaning. When Congress in 1994 amended Section 3561(a)(3) to include that phrase, it specifically permitted a sentencing court in a petty offense

case to deviate from the otherwise applicable general prohibition on combining continuous incarceration and probation in a single sentence.  Ignoring that amended language would improperly fail to "give effect to every clause and word" of Section 3561(a)(3).  *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013).

Congress's unenacted language from 1991 does not suggest that a split sentence is available only where a defendant is sentenced at the same time for two different petty offenses or for two offenses, at least one of which is a petty offense.  For one thing, the Supreme Court has regularly rejected arguments based on unenacted legislation given the difficulty of determining whether a prior bill prompted objections because it went too far or not far enough.  *See Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989) ("We do not attach decisive significance to the unexplained disappearance of one word from an unenacted bill because 'mute intermediate legislative maneuvers' are not reliable indicators of congressional intent.") (citation omitted).  Moreover, under that view, every offense other than a petty offense could include some period of incarceration and some period of supervision (whether that supervision is supervised release or probation).  Yet so long as a defendant was convicted of two petty offenses, that defendant could be sentenced to incarceration and supervision (in the form of probation).  No sensible penal policy supports that interpretation.

It follows that a sentencing court may impose a combined sentence of incarceration and probation where, as here, the defendant is convicted of a petty offense.  The defendant pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building, which is a "petty offense" that carries a maximum penalty that does not exceed six months in prison and a $5,000 fine.  *See* 18 U.S.C. § 19; *see United States v. Soderna*, 82 F.3d

1370, 1381 n.2 (7th Cir. 1996) (Kanne, J., concurring) (citations omitted) (noting that a petty offender may face a sentence of up to five years in probation).

**B.  A sentence of probation may include incarceration as a condition of probation, though logistical and practical reasons may militate against such a sentence during an ongoing pandemic.**

*1.   Relevant background*

In 18 U.S.C. § 3563, Congress set out "[c]onditions of probation."  18 U.S.C. § 3563. Among the discretionary conditions of probation a sentencing court may impose is a requirement that a defendant

> remain in the custody of the Bureau of Prisons during nights, weekends or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release.

18 U.S.C. § 3563(b)(10).  Congress enacted this provision to give sentencing courts "flexibility" to impose incarceration as a condition of probation in one of two ways.  S. Rep. No. 225, 1983 WL 25404, at *98.  First, a court can direct that a defendant be confined in "split intervals" over weekends or at night.  *Id.*  Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two."  *Id.*[13]

*2.   Analysis*

A sentencing court may impose one or more intervals of imprisonment up to a year (or the statutory maximum) as a condition of probation, so long as the imprisonment occurs during "nights, weekends or other intervals of time."  18 U.S.C. § 3563(b)(10).  Although the statute does not define an "interval of time," limited case law suggests that it should amount to a "brief period"

---

[13] Section 3563(b)(10)'s legislative history notes that imprisonment as a term of probation was "not intended to carry forward the split sentence provided in Section 3561, by which the judge imposes a sentence of a few months in prison followed by probation."  S. Rep. No. 225, 1983 WL 25404, at *98.

of no more than a "week or two" at a time. *United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history described above and reversing magistrate's sentence that included 30-day period of confinement as a condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also Anderson*, 787 F. Supp. at 538 (continuous 60-day incarceration not appropriate as a condition of probation); *Forbes*, 172 F.3d at 676 ("[S]ix months is not the intermittent incarceration that this statute permits."). Accordingly, a sentence of up to two weeks' imprisonment served in one continuous term followed by a period of probation is permissible under Section 3563(b)(10).[14]

A sentencing court may also impose "intermittent" confinement as a condition of probation to be served in multiple intervals during a defendant's first year on probation. 18 U.S.C. § 3563(b)(10); *see Anderson*, 787 F. Supp. at 539. Notwithstanding a sentencing court's legal authority to impose intermittent confinement in this manner, the government has refrained from requesting such a sentence in Capitol breach cases given the potential practical and logistical concerns involved when an individual repeatedly enters and leaves a detention facility during an ongoing global pandemic. Those concerns would diminish if conditions improve or if a given facility is able to accommodate multiple entries and exits without unnecessary risk of exposure. In any event, the government does not advocate a sentence that includes imprisonment as a term of probation in the defendant's case given the requested 90-day imprisonment sentence.

---

[14] Section 3563(b)(10)'s use of the plural to refer to "nights, weekends, or intervals of time" does not imply that a defendant must serve multiple stints in prison. Just as "words importing the singular include and apply to several persons, parties, or things," "words importing the plural include the singular." 1 U.S.C. § 1; *see* Scalia & Garner, *supra*, at 129-31.

## VI.     Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Lazo to 90 days' incarceration, 36 months' probation, 60 hours of community service, and $500 restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his early acceptance of responsibility.

Respectfully submitted,

MATTHEW GRAVES
UNITED STATES ATTORNEY
DC BAR NO. 481052

By:     *Douglas Meisel*
DOUGLAS MEISEL
NY Bar No. 4581393
Trial Attorney (Detailee)
U.S. Attorney's Office
601 D Street, N.W.
Washington, D.C.  20530
Douglas.meisel@usdoj.gov
(202) 598-2281