**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| | ) | |
| **UNITED STATES OF AMERICA** | ) | **Crim. No.  21-425 (CRC)** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **KENE BRIAN LAZO** | ) | |
| | ) | |
| | ) | |

<u>**MEMORANDUM IN AID OF SENTENCING**</u>

On the morning of January 6th, Kene Lazo drove from Norfolk, VA to Washington, D.C.  He was one of thousands of people who came to the Capitol that day, one who believed a falsehood advertised to millions – that former Vice President Mike Pence had the power to overturn the "fraudulent election."  As a result, he traveled to Washington, D.C., to "Stop the Steal."

Months prior to the 2020 election, Former President Trump made several claims attacking the security of mail-in ballots and about the possibility of a rigged election.[1]  He tweeted a month before the election, that this would be "the most corrupt Election in American history!"[2]   On November 3, 2020, approximately, 74 million people voted for Trump in the 2020 election.  He declared that he won the election.[3]  By this time, 74 million people were acclimated to the idea that if Trump did not win, the election was stolen.  Trump and his supporters repeated this falsehood.

Mr. Lazo believed every word.  He went to the Capitol wrapped in the American flag.  He carried a shield that reflected the precise attacks that Trump

---

[1]      Steve Inskeep, *Timeline: What Trump Told Supporters For Months Before They Attacked*, NPR Politics, February 8, 2021, available at https://www.npr.org/2021/02/08/965342252/timeline-what-trump-told-supporters-for-months-before-they-attacked (last viewed on Aug. 4, 2022); see also Alexandra Hutzler, *Trump Started Tweeting About Election Fraud in April 2020, Eight Months Before Capitol Riot*, Newsweek, February 10, 2021, available at https://www.newsweek.com/trump-started-tweeting-about-election-fraud-april-2020-eight-months-before-capitol-riot-1568365 (last viewed on Aug. 4, 2022)

[2]      John Woolley and Gerhard Peters, *Donald J. Trump Tweets of October 7, 2020,* at 02:14:11, The American Presidency Project, U.S. Santa Barbara, available at https://www.presidency.ucsb.edu/documents/tweets-october-7-2020 (last viewed on Aug. 4, 2022)

[3]      Inskeep, footnote 2 *supra.*

espoused:

    1) the media cannot be trusted;[4]

    2) left-leaning groups were extremists;[5]

    3) the mail-in ballots were fraudulent;[6] and

    4) the pandemic was a hoax.[7]

By the time of the election, "Trump's claim[s] [were] **persuasive** to many because the idea was already **part of their DNA**."[8]  Hence, by November 2020, it was "not that difficult to believe Biden did not win legitimately when your mind is made up and not open to persuasion, especially when you are **continually**

---

[4]    See Manuel Roig-Franzia and Sarah Ellison, *A history of the Trump War on Media — the obsession not even coronavirus could stop*, The Washington Post, March 29, 2020, available at https://www.washingtonpost.com/lifestyle/media/a-history-of-the-trump-war-on-media--the-obsession-not-even-coronavirus-could-stop/2020/03/28/71bb21d0-f433-11e9-8cf0-4cc99f74d127_story.html (last accessed on Aug. 9, 2022)(" The anti-media antagonism can manifest like an organized crusade in some cases but also more like a culture — a vernacular shared by the president and his allies on the right. Their battles are waged in the courts, on social media and at rallies where Trump's rants against the journalists who cover him goad his fans into taunting the camera crews and booing the press pens.").

[5]    See Nicholas Bogel-Burroughs and Sandra E. Garcia, *What Is Antifa, the Movement Trump Wants to Declare a Terror Group?*, The New York Times, Sept. 28, 2020, available at https://www.nytimes.com/article/what-antifa-trump.html (last accessed on Aug. 9, 2022) ("Seeking to assign blame for the protests against racial injustice that spread across the United States this summer, President Trump has said that the United States would designate antifa as a terrorist organization.").

[6]    Inskeep, footnote 2 *supra*.

[7]    Chris McGreal, 'It's a hoax. There's no pandemic': Trump's base stays loyal as president fights Covid, The Guardian, Oct. 3, 2020, available at https://www.theguardian.com/us-news/2020/oct/03/donald-trump-base-stays-loyal-president-fights-covid-19 (last accessed on Aug. 9, 2022) ("

[8]    Stephen Stathis, *Why do so many still believe the 2020 election was stolen?*, The Hill, April 11, 2022, available at https://thehill.com/opinion/campaign/3263802-why-do-so-many-still-believe-the-2020-election-was-stolen/ (emphasis added; last accessed on Aug. 4, 2022).

**bombarded with conspiracy theories and unsubstantiated claims by Trump, social media, and news sources designed to undermine the validity of the results."**[9]

In other words, this falsehood became more than a "truth" to many – it would be a reality for which they would risk everything.  Mr. Lazo risked everything by attending the rally and entering the Capitol.  The business he started with his wife, Rodbustars, had to close.  The business shutdown took an additional toll on him after COVID-19 made his work challenging.  He faced unbelievable media scrutiny.

While Mr. Lazo's participation in January 6th was serious, he had no intent to harm anyone or overthrow the government.  He accepted responsibility and is remorseful for his conduct.  For these reasons and the relevant sentencing factors pursuant to 18 U.S.C. § 3553(a), the defense respectfully requests a sentence of probation, which would be a sentence not greater than necessary to address his conduct in this case.

### TIMELINE OF JANUARY 6th EVENTS

The timeline of January 6th is well-known.  Approximately 30,000 people were expected to attend.[10]  Around 6 a.m that day, numerous Trump supporters

---

[9]    Stathis, footnote 8, *supra* (emphasis added).

[10]   Though President Trump boasted that the rally numbered "hundreds of thousands of people", the rally's organizers projected just 30,000 participants.  *See* Andrew Beaujon, *Here's What We Know About the Pro-Trump Rallies That Have Permits*, The Washingtonian (Jan. 5, 2021), available at https://www.washingtonian.com/2021/01/05/heres-what-we-know-about-the-pro-trump-rallies-that-have-permits/.

headed towards the rally at the Ellipse and "[m]any began gathering the night before."[11]  The vitriol and antagonistic speech spread over the crowd of thousands. Mr. Lazo attended the speeches.  Prominent Trump supporters encouraged the crowd to march to the Ellipse and fight:

| | |
|---|---|
| **11 a.m.** | High-profile figures of the Republican Party spoke directing the Trump supporters: |

- Representative Mo Brooks (R-Ala.) urged "American patriots" to "**start taking down names and kicking ass**."[12]
- Katrina Pierson stated, "Americans will stand up for themselves and protect their rights, and they will demand that the politicians that we elect will uphold those rights, or **we will go after them**."[13]
- Amy Kremer, one of the organizers of the "Save America" rally and moderator of the "Stop the Steal" Facebook group, echoed others' calls for Republican lawmakers to challenge the election result and **"punch back from Donald Trump."**[14]
- Lara and Eric Trump, the president's daughter-in-law and son, encouraged the attendees **to march on the Capitol to "stand up for this country and stand up for what's right."**[15]

---

[11]    George Petras, Janet Loehrke, Ramon Padilla, Javier Zarracina and Jennifer Borresen, *Timeline: How the storming of the U.S. Capitol unfolded on Jan. 6*, USA Today, Updated Feb. 9, 2021, available at https://www.usatoday.com/in-depth/news/2021/01/06/dc-protests-capitol-riot-trump-supporters-electoral-college-stolen-election/6568305002/ (last accessed on Feb. 28, 2022).

[12]    *See* Matthew Choi, *Trump is on trial for inciting an insurrection. What about the 12 people who spoke before him?*, Politico (Feb. 10, 2021), available at https://www.politico.com/news/2021/02/10/trump-impeachement-stop-the-steal-speakers-467554 (emphasis added).

[13]    *Id*. (emphasis added).

[14]    *Id*. (emphasis added).

[15]    *Id*. (emphasis added).

- Donald Trump, Jr. narrated that "You have an opportunity today: **You can be a hero, or you can be a zero**. And the choice is yours but we are all watching."[16]
- Rudy Giuliani, President Trump's personal attorney also spoke, making his now-infamous call for "**trial by combat**."[17]

An hour later, former President Trump took the stage and implored

attendees to "fight" for him, notably stating:

| | |
|---|---|
| **12 p.m.** | We will not let them silence your voices. . . **we're going to walk down to the Capitol**, and we're going to cheer on our brave senators and congressmen and women, and we're probably not going to be cheering so much for some of them. . . [if the election is certified], you will have an illegitimate president. That's what you'll have. And we can't let that happen.[18] |
| **1:10 p.m.** | And we fight. **We fight like hell. And if you don't fight like hell**, you're not going to have a country anymore. . . So we're going to, we're going to walk down Pennsylvania Avenue. I love Pennsylvania Avenue. **And we're going to the Capitol**, and we're going to try and give.[19] |

---

[16]  *Id*. (emphasis added).

[17]  *Id*. (emphasis added).

[18]  *See* Brian Naylor, *Read Trump's Jan. 6 Speech, A Key Part Of Impeachment Trial*, NPR (Feb. 10, 2021), available at https://www.npr.org/2021/02/10/966396848/read-trumps-jan-6-speech-a-key-part-of-impeachment-trial.

[19]  *See* Brian Naylor, *Read Trump's Jan. 6 Speech, A Key Part Of Impeachment Trial*, NPR (Feb. 10, 2021), available at https://www.npr.org/2021/02/10/966396848/read-trumps-jan-6-speech-a-key-part-of-impeachment-trial; see also Petras, *Timeline*, footnote 2 supra, https://www.usatoday.com/in-depth/news/2021/01/06/dc-protests-capitol-riot-trump-supporters-electoral-college-stolen-election/6568305002/ (last accessed on Feb. 28, 2022) (emphasis added).

By this time, his supporters started heading towards the Capitol and started fighting with the police.

| | |
|---|---|
| **<u>1:10 p.m.</u>** | Supporters "begin grappling with police on the Capitol steps." [20] |
| **<u>1:30 p.m.</u>** | After Trump's speech, "supporters being marching toward the U.S. Capitol."[21]  Mr. Lazo walked with hundreds of others to the Capitol building. |
| **<u>2:11 p.m.</u>** | Photographs indicate that supporters moved past the police lines on the west side of the Capitol and others scale the walls.[22] |
| **<u>2:34:54 p.m.</u>** | Mr. Lazo enters the Capitol through the Upper West Terrace doors, *after someone else opens the door*. [23] |

---

[20]   Petras, *Timeline*, footnote 2 supra.
[21]   Shelly Tan, Youjin Shin and Danielle Rindler, *How one of America's ugliest days*
*unraveled inside and outside the Capitol*, The Washington Post,
https://www.washingtonpost.com/nation/interactive/2021/capitol-insurrection-visual-timeline/ (last accessed on Feb. 28, 2022).
[22]   Petras, *Timeline*, footnote 2 supra.
[23]   See Defense Exhibit 1, Video of Entrance.





**2:35 p.m.**          After entering the Upper West Terrace doors, Mr.
Lazo, along with others, walks through another set
of doors.[24]  Officers are seen on either side of the

---

[24]    See Defense Exhibit 2, Video of Upper West Terrace.

8

door.[25]  Mr. Lazo does not engage with the officers or confront them.  The officers do not confront him either.

**2:35 p.m. – 2:39 p.m.**            Mr. Lazo proceeds up the stairs to the Rotunda and is seen walking around with at least 100 other people, some of whom are chanting and waving Trump flags.[26]



**2:39 p.m.-2:40 p.m.**            Mr. Lazo exits the Rotunda and *heads to the exit door* but is not able to leave because hundreds of people are entering the exit door.  Mr. Lazo is circled in red below.  The crowd entering is in the yellow box below.[27]

---

[25]      See Government Exhibit A, minutes 02:15 to 02:25.
[26]      See Defense Exhibit 3, Video of Rotunda.
[27]      See Defense Exhibit 4, Video of Rotunda Interior Doors.



**2:42 p.m.**                    After not being able to exit the building, Mr. Lazo
                                 follows the flow of people upstairs.  There were no
                                 marked signs in this corridor.

**2:43 p.m. to 2:44 p.m.**       Mr. Lazo heads down the corridor toward the
                                 Senate Gallery, following the crowd of people.  He
                                 follows others who enter the Senate Gallery and is
                                 there for approximately 30 seconds (from 2:44:02
                                 p.m. to 2:44:33 p.m.).[28]

---

[28]     See Defense Exhibits 5 (Senate Gallery video 1) and 6 (Senate Gallery video
2).





**2:44:33 p.m. to 2:51 p.m.**   After exiting the Senate Gallery on the 3rd floor, Mr. Lazo is still trying to figure out which direction to go to exit the Capitol.  He goes down a flight of stairs to the second floor and walks around.  He

walks towards an exit door with others.[29]  See minute 2:51:26 p.m.

In less than 30 seconds, Mr. Lazo and others come back through the door they exited, after realizing it was not an exit for the building.[30]  See minute 2:51:52 p.m.



---

29    See Defense Exhibit 7, East Front Corridor video 1.
30    See Defense Exhibit 8, East Front Corridor video 2.

12



**2:53 p.m.**          Mr. Lazo returns to the Rotunda Door and is able to exit.



## LEGAL PRINCIPLES

Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G), is a class B misdemeanor or "petty offense", as defined by 18 U.S.C. § 3559(a)(7), because it carries a maximum incarceration period of six months or less.  The United States Sentencing Guidelines (Guidelines) do not apply to class B misdemeanors.  *See* U.S.S.G. §1B1.9.  In addition, pursuant to 18 U.S.C. § 3583(b)(3), the Court is disallowed from imposing a term of supervised release for a petty offense, and if it imposes active, continuous imprisonment. 18 U.S.C. § 3551 seemingly does not support an additional period of probation to follow.  *See United States v. Torrens et. al.*, Crim. No. 21-cr-204 (BAH), ECF No. 110, 113, & 125.

Since the Guidelines do not apply, the Court is directed to look to 18 U.S.C. § 3553(a) to impose a sentence that is "sufficient, but not greater than necessary, to comply with the purposes [of sentencing]."  The factors enumerated in 18 U.S.C. § 3553(a)(1) include "the nature and circumstances of the offense and the history and characteristics of the defendant."  Additionally, the Court should determine the "need" for the sentence, by considering if and how a term of incarceration would "reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense."  *Id*. at (2)(A).  Moreover, the Court should consider how a sentence would "afford adequate deterrence to criminal conduct," "protect the public from further crimes of the defendant," and "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."  *Id*. at 2 (B-D).  Further still, the Court

14

must be mindful of "the kinds of sentences available," should consider "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct," and should consider the "need to provide restitution to any victims of the offense."  *Id*. at (3), (6), & (7).

## ARGUMENT

Mr. Lazo is a hardworking father of four children.  He was the co-owner of a construction business, Rodbustars, which was eventually closed after January 6th. While the nature and circumstances of the January 6th events were indeed serious, his particular actions that day, paired with his individual history and characteristics do not lend itself to a sentence of incarceration.  Rather, a sentence of probation and restitution would meet the purposes of sentencing, without being overly punitive.  A probationary sentence would provide adequate deterrence to Mr. Lazo and avoid an unwarranted sentencing disparities among other January 6th defendants.

### I.   <u>Nature and Circumstances of Mr. Lazo's Offense</u>

The events of January 6th are seared into the nation's memory.  That day and the days after resulted in lost lives and over 1 million dollars in property damage. In addition, it caused trauma to politicians and staffers and their family members who were present there and who watched from a far.

Mr. Lazo understands and would never minimize the impact of the event on the nation.  However, he was not the cause of January 6th, nor was he in the category of people who caused physical harm to others or damage to the Capitol

buildings.  He entered the building, but his unlawful entrance cannot, and should not, be conflated with the many other, wider, failures that occurred that day. Various factors led to the Capitol being breached, including "paralysis" "exacerbated by the patchwork nature of security across a city where responsibilities are split between local and federal authorities" and "driven by unique breakdowns inside each law enforcement agency."[31]  To characterize Mr. Lazo as the proximate cause of the January 6th event fails to acknowledge these other failures, and places an unjust blame on one non-violent, non-destructive individual.  The American system of justice, and specifically 18 U.S.C. § 3553(a), directs this Honorable Court to look at every defendant and every defendant's actions individually.  *See Kimbrough v. United States*, 552 U.S. 85, 90 (2007); *Gall v. United States*, 552 U.S. 38 (2007).

As stated above, Mr. Lazo entered the Capitol building after Trump directed the crowd to march to the Capitol.  He entered and left the building within approximately 19 minutes.  He attempted to exit the building at 2:40 p.m., approximately 8 minutes after entering but there was a large crowd forcibly entering the exit doors from the Rotunda.  While inside, Mr. Lazo did not assault officers or anyone else.  He did not search through documents.  He did not go to clearly marked sensitive areas of the Capitol.  He did not seek members of

---

[31]     *See* Jacqueline Alemany, et. al., *Before, During, and After Bloodshed*, The Washington Post (Oct. 31, 2021), available at https://www.washingtonpost.com/politics/interactive/2021/what-happened-trump-jan-6-insurrection/?itid=hp-top-table-main.

Congress.  He chanted along with the crowd for a few moments sporadically.  He passed by officers without any altercation.

He was dressed as what could be called a costume, wrapped in the American flag and carrying a shield which had four statements that reflected Trump's attacks on the 2020 election.   Comments on his Facebook page reflect that his outfit was seen as a costume – one comment on his page said, "You look like Superman Brian..stay safe and healthy always."  ECF No. 1 at 3, Criminal Complaint.[32]  When he was inside the Capitol, he stated on Facebook, "inside Congress," and he received well wishes.

---

[32]   According to the Criminal Complaint, one Facebook user suggested that Mr. Lazo carry a blade in his boot to the Capitol.  He responded that it would be illegal to do so, and instead he would carry a baton and pepper spray.  See ECF No. 1 at 5. His wife informed law enforcement that to her knowledge that baton and pepper spray were not taken to the Capitol.  Mr. Lazo later stated that he took the broom to the Capitol.   Notably, the Facebook account Mr. Lazo used was shared with his wife and the messages were deleted.  See id. ("Though the Facebook account "Fam Council" was deleted shortly after January 6, the FBI obtained Facebook records through a search warrant. The returns from Facebook revealed that LAZO operates the page with his wife.").



A few days later, when his wife found out that he went to the Capitol, she was angry with him. She took his belonging from the trip and threw them away in a dumpster. Mr. Lazo was very apologetic to his wife.

## II.   <u>**Mr. Lazo's History and Characteristics**</u>

Kene Lazo was born in the Philippines and became a naturalized U.S. Citizen when he was a child. His biological father was not in his life for many years. His biological father lived with his other family. His mother married a U.S. Citizen when Mr. Lazo was approximately six or seven years old. His stepfather was the only father figure in his life.  Unfortunately, his mother and stepfather had a volatile relationship. He was placed in foster care for a period of time when he was around 7 years old. He recalled that he could barely speak English. He did not remember how long he was in foster care. Eventually, he was returned to his mother and stepfather's care. His mother and stepfather separated and divorced

when the defendant was around 15 years old.  He decided to live with his stepfather
after they separated.

Mr. Lazo's mother confirmed that her ex-husband physically abused her.  She
also explained he was physically abusive to Mr. Lazo as well.  She blames herself
for not leaving the marriage earlier to protect her children from the abuse.

The importance of positive male role models in a person's life is well-known.
"Children who bond early with their fathers (or father figures), in fact, often possess
sharper cognitive skills, are better problem-solvers and perform more strongly in
school, putting them at an advantage over children with distant or absent dads." [33]
Furthermore, "A father who has a good relationship with the mother of their
children is more likely to be involved and to spend time with their children and to
have children who are psychologically and emotionally healthier." [34]  In Mr. Lazo's
case, he witnessed his stepfather abuse his mother.  Notably, "research has shown
that husbands who display anger, show contempt for, or who stonewall their wives

---

[33]     Bevone Ritchie, *Male role models make a huge impact on a child's life*, Miami
Herald, Updated June 12, 2018,
https://www.miamiherald.com/news/local/education/article213061544.html (last
accessed on February 24, 2021);
[34]     Jeffrey Rosenberg and W. Bradford Wilcox, *The Importance of Fathers in the
Healthy Development of Children*, Child Abuse and Neglect User Manual Series,
U.S. Dep't of Health and Human Services, Administration for Children and
Families, Administration on Children, Youth, and Families, Children' Bureau,
Office on Child Abuse and Neglect, available at
https://www.childwelfare.gov/pubpdfs/fatherhood.pdf (last accessed on March 9,
2022).

(i.e., "the silent treatment") are more likely to have children who are anxious, withdrawn, or antisocial."[35]

Unfortunately, the abuse he witnessed as a child played a role in his own family life. In August 2021, Mr. Lazo was arrested for domestic violence. He pled guilty to Assault and Battery. He has taken advantage of every opportunity to grow and improve himself. He has completed several hours of parenting classes.[36] He was assessed for drug abuse and it was determined that he did not need drug treatment.[37] Mr. Lazo has been volunteering his time at his church, with Keep Norfolk Beautiful Foundation, and with the Chesapeake Bay Foundation. His pastor describes that the church has "seen the transformation in [Mr. Lazo's] life and [he] continues to show his willingness to be a better person."[38]

Mr. Lazo continues to make progress and has visitation with children. The guardian *ad litem* noted that the Capitol case and the COVID lockdown had an effect on Mr. Lazo, but that he is making progress.[39]

---

[35]   Rosenberg and Wilcox, footnote 34, *supra*.
[36]   See Exhibit 9, parenting certificates.
[37]   See Exhibit 10, drug assessment letter.
[38]   See Exhibit 11, Letter from Pastor.
[39]   See Exhibit 12, Guardian *ad litem*, (under seal).

### III.   <u>A Period of Incarceration Followed by a Period of Probation is Impermissible</u>

The government continues to request illegal split sentences, insisting that there are now other courts in this jurisdiction who have agreed that these types of sentences are permissible.[40] One of these illegal sentences is now pending appeal before the D.C. Circuit. *See United States v. Little*, 22-3018 (originating docket No. 21-cr-315 (RCL)). In *United States v. Madden*, 21-cr-55 (EGS), the Honorable Emmet G. Sullivan requested that the defense provide briefing explaining why it believes the district court in *Little* erred in imposing a split sentence. The defense submitted a supplemental brief addressing the court's question. Mr. Lazo adopts all of the arguments contained in that brief.   See 21-cr-55, ECF No. 39.  For all of the reasons stated in *Madden*, the court is not permitted to impose a split sentence as doing would raise significant constitutional concerns.  Furthermore, the plea agreement nowhere indicates or notifies Mr. Lazo that he may be subject to both 6 months' incarceration and 5 years' probation.  A correct reading of the relevant

---

[40]   Most judges in this district confronted with the government's request for a split sentence for one single petty offense conviction have declined to impose such a sentence.  *See United States v. Spencer*, 21-CR-147 (CKK) (amending sentence after briefing provided), ECF No. 70; *United States v. Torrens*, No. 21-cr-204 (BAH), ECF No. 110 & 125); *United States v. Kari Kelley*, 21-CR-201 (DLF) (At sentencing on March 17, 2022, Judge Friedrich rejected the government's contention that a split sentence could be imposed even after being provided notice of the *Little* decision); *United States v. Jacob Wiedrich*, 21-CR-581 (TFH) (Judge Hogan also rejecting government's proposal for split sentence); *United States v. Vic Williams*, 21-CR-388 (RC) (court did not impose split sentence despite government's recommendation of split sentence); *United States v. Zachary Wilson*, 21-CR-578 (APM) (same); *United States v. Traci Sunstrum*, 21-CR-652 (CRC) (same); *United States v. Michael Carico*, 21-CR-696 (TJK) (same); *United States v. Tanner Sells*, 21-CR-549 (ABJ) (same).

statutes and the legislative history, as discussed in the defense pleadings in *Madden*, make it clear that a district court has a dichotomous choice: it can either sentence the defendant to imprisonment up to six months, or it can sentence the defendant to probation for up to five years. Where, as here, there is solely one single petty offense, the statute precludes a combined probationary and a sentence of incarceration.

Lastly, the government asserts that, at a minimum, the Court can impose intermittent confinement as a condition of probation. *See* ECF No. 39 at 38. However, that is still considered a Bureau of Prisons sentence and is not permissible for the same reasons discussed in *Madden*. The Court does not have statutory authority to impose any sentence of imprisonment and probation for a petty offense regardless of what the incarceration is called.

For a petty offense, it is unclear at what point an "interval of time" effectively becomes a "term of imprisonment" and therefore would constitute an unauthorized sentence of both imprisonment and probation. Cf. 18 U.S.C. §3583(d) (term of intermittent confinement pursuant to §3563(b)(10) may be imposed only for a *violation* of condition of supervised release). A sentence of "intermittent confinement" as a condition of probation for a petty offense raises significant issues and potential constitutional issues. *See United States v. Voda*, 994 F.2d 149, 151 n.2 (5th Cir. 1993) ("Voda expressly waived any argument that imposition of sixty days' confinement served over sixty day period is "imprisonment," as opposed to intermittent confinement, and thus a violation of section 3562"); *United States v.*

*Baca*, 2011 WL 1045104 (C.D. Cal. March 18, 2011) supra at *2 (45 day condition of confinement violates statute).

### IV. A Probationary Sentence Would Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense.

18 U.S.C. § 3553(a)(2)(A) provides that the Court must assess "the need for the sentence imposed— . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." Incarceration is not required in order for a sentence to reflect the seriousness of the offense. "A sentence of probation rather than incarceration can work to promote the sentencing goal of respect for the law by illustrating a rejection of the view that the law is merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." *United States v. Bennett*, No. 8:07CR235, 2008 U.S. Dist. LEXIS 45302, at *12 (D. Neb. May 30, 2008) (citing *Gall*, 552 U.S. at 99).

To determine a just punishment for Mr. Lazo, the Court must consider the conditions under which an individual will serve time if the Court decides to incarcerate the individual. Since the beginning of the COVID-19 pandemic, the virus spread rampantly in detention facilities. Thousands of BOP inmates have tested positive for COVID-19 and the latest BOP numbers show that 299 inmates have died from COVID-19.[41]  With the rise of COVID-19 variants, the risks of

---

[41]     *See* Fed. Bureau of Prisons, *COVID-19 Cases*, https://www.bop.gov/coronavirus/ (last accessed July 5, 2022).

contracting the virus and death remain a serious concern for inmates.

**V.     A Probationary Sentence Would Provide Adequate Deterrence
to Criminal Conduct and Protect the Public from the Unlikely
Chance of Further Crimes of Mr. Lazo.**

Under 18 U.S.C. § 3553(a)(2)(B) and (a)(2)(C), this Court must also consider

"the need for the sentence imposed—. . . to afford adequate deterrence to criminal

conduct...[and] to protect the public from further crimes of the defendant." The

public will be protected while Mr. Lazo is being supervised by the Probation Officer,

which will further deter any criminal conduct. In addition, he is still required to

comply with the requirements of his family case in order to maintain a relationship

with his children.

While "[p]rison is an important option for incapacitating and punishing those

who commit crimes," evidence suggests that lengthy prison sentences do not have a

"chastening" effect and "produce at best a very modest deterrent effect." *Five

Things About Deterrence*, Nat'l Inst. Justice, U.S. Dep't of Justice, 1-2 (May 2016).

With respect to specific deterrence, research shows conclusively that "[t]he *certainty*

of being caught is a vastly more powerful deterrent than the punishment," that

"[s]ending an individual convicted of a crime to prison isn't a very effective way to

deter crime," and that "[i]ncreasing the severity of punishment does little to deter

crime." *Id.* (emphasis in original); *see also* James Austin *et al.*, *How Many

Americans Are Unnecessarily Incarcerated?*, Brennan Ctr. For Just., N.Y. Univ.

School of Law, 22 (2016) (quoting a 2011 study by criminologists concluding that

"across all offenders, prisons do not have a specific deterrent effect. Custodial

sentences [jail and prison] do not reduce recidivism more than noncustodial sanctions.").  No incarceration is needed to deter criminal conduct in this case. Furthermore, the public nature of the case and the effect on Mr. Lazo's reputation serve as deterrents to future behavior.

**VI.    A Sentence of Probation Would Not Create An Unwarranted Sentencing Disparity**

Sentencing Mr. Lazo to probation would not contribute to an unwarranted sentencing disparity.  Over 200 defendants have been sentenced in these cases.  At least 80% of the cases have been resolved as misdemeanor offenses.  Of the misdemeanors cases, more than half have been sentenced to probation or home detention as a condition of probation.  January 6th defendants in other cases who pled to the *exact* same federal charge received probationary sentences.  *See United States v. Rachel Pert*, Crim. No. 21-cr-00139 (sentenced to 24 months' probation); *United States v. Jeffrey Witcher*, Crim. No. 21-cr-00235 (12 months' probation); *United States v. Nicholes Lentz*, Crim. No. 21-cr-00053 (1 month home detention and 36 months' probation).

This case is different from the cases on which the government relies.  See ECF No. 39 at 25-27 (citing *United States v. Nalley*, Crim. No. 21-cr-116; *United States v. Mish*, 21-cr-112; *United States v. Bonet*, 21-cr-121; *United States v. Ryan*, 21-cr-050; and *United States v. Little*, 21-cr-315).

As the government explained in its brief, in *United States v. Nalley*, the defendant plead to the Class A misdemeanor.  Nalley was in the Capitol for 30 to 40 minutes, which is nearly double the amount of time, Mr. Lazo was inside the

Capitol.  Nalley, unlike Mr. Lazo, threatened to come back to the Capitol with guns. Nalley's conduct was worse than Mr. Lazo's and he received two years' probation.

In *United States v. Mish*, the defendant was present in the area where Ashli Babbitt was shot.  Crim No. 21-cr-112, Gov't Sent. Memo, ECF No. 38 at 3.  Mish spent at least 29 minutes inside the Capitol.  He recorded a video downplaying the violence in the Capitol.  He also had an extensive criminal history.  By contrast, Mr. Lazo was in the Capitol for 19 minutes, and did not downplay violence, and he does not have an extensive criminal history.

In *United States v. James Bonet*, Crim. No. 21-cr-121, Bonet entered Senator Merkley's office.  Bonet, unlike Mr. Lazo, smoked marijuana inside of the Senator's office and then headed for the Crypt.  Bonet also described the protest as peaceful. Furthermore, according to the government, Bonet also described officers as "'scumbags' before posting it on social media.  As the officers fired crowd control munitions, Bonet yelled multiple times that they were 'pieces of s[$%!]' claiming they were 'shooting' at 'innocent protestors.'" *See Bonet*, 21-cr-121, Gov't Sent. Memo, ECF No. 45, p.5.  Bonet also posted videos of himself at the Capitol claiming to be "taking [] back" the Capitol and footage of himself smoking marijuana.  Id. at pp. 6-9.  Here, Mr. Lazo did not yell at officers or yell expletives at or about them. He also did not smoke marijuana inside the Capitol.

In *United States v. Ryan*, Crim No. 21-cr-050, the defendant was extremely active on social media, unlike Mr. Lazo.  Ryan "publicly cheer[ed] [the] violent attack."  21-cr-50, Gov't Sent. Memo, ECF No. 48 at 1.  She "promoted additional

violence beyond the Capitol" and described January 6th as the "best day of [her] life." Id. at ECF No. 48 at 3. Ryan infamously stated that she was not going to jail because she is "white and has blonde hair." Mr. Lazo did not make any such comments.

In *United States v. Little*, Crim No. 21-cr-315, as the government stated, the defendant there threatened civil war with gun violence. Mr. Lazo did no such thing. Also, Little did not show remorse, whereas here, Mr. Lazo showed remorse to his wife afterwards and he was tearful during the plea colloquy where it was clear he was remorseful for his conduct.

Mr. Lazo's case is more similar to *United States v. Kevin Strong*, Crim. No. 21-cr-114. In that case, Strong was in the Capitol for less than 30 minutes. He chanted and also had to go with the flow of the crowd because he could not find an exit out due to the huge crowd. Similarly, Mr. Lazo chanted, and it is clear from the surveillance videos that he was trying to find his way out of the Capitol for most of the time he was inside the Capitol.

The government contends that individuals who entered into sensitive spaces of the Capitol should receive stricter punishment. See Gov't Sent. Mem. at 2, 18, 27. However, in cases involving sensitive spaces, the individuals there did more than enter a private office or sensitive space of the Capitol. For example, in *United States v. Derek Jancart*, 21-cr-148 (JEB), the defendant entered the Capitol within 5 minutes of the breach. See Jancart 21-cr-148, Gov't Sent. Mem. ECF No. 25 at 5. He went to the Speaker's conference room area. While he did not go inside, he took

27

a picture, and posted it online, stating " 'We're In[.]' " Id. at 6 (quoting Gov't Sent.
Mem. at 6).  As the government stated in that case, Jancart "spread false
propaganda [on Facebook] that the attack was 'peaceful[,]' comparing the riot to an
'unscheduled tour.' " Id. at 8.  Mr. Lazo did not spread false propaganda after Jan.
6th.

In *United States v. Oliver Sarko*, 21-cr-591, the defendant made incendiary
statements while inside the Capitol on video:  "Where are the traitors?" "Bring out
Pelosi!" "We won't let you steal this country." "We're actually breaking in right
now." "Fight for Trump!" "Beijing Biden will never be president, we reject
communism."  *Sarko*, 21-cr-591, ECF 31, Gov't Sent. Mem. at 11.  In that case, the
government noted that since Sarko live streamed these incendiary statements on
Snapchat, "anyone else who accessed Snapchat, potentially millions of persons,
including other January 6, rioters, could have listened to those remarks when they
were made" and his "demands to 'bring out' Nancy Pelosi" and "to find the 'traitors'
were particularly chilling because they could have been seen as a call to arms to
other rioters to take violent action inside the Capitol."  Id. at 11.  Mr. Lazo made no
such remarks.  Sarko received 30 days' incarceration and 3 years' probation.

In *United States v. Brian Stenz*, 21-cr-456, the defendant entered the Capitol
and appeared to take a puff of possibly THC from a vaping pen upon entering.
*Stenz*, 21-cr-456, ECF No. 32, Gov't Sent. Mem. at 5.  It appears that he went to
Senator Merkley's office and remained there for 4 minutes.  Stenz took a picture of
the Senator's office and sent it to a friend.  Senator Merkley noted that people

appeared to have been "smoking something" in his office. Id. at 7. Mr. Lazo spent seconds in the Senate Gallery and did not smoke anything inside. Stenz also had a criminal history. Stenz received 14 days' incarceration as a condition of probation, 2 months' home detention, and 36 months' probation.

Lastly, another case to contrast against the present case is *United States v. Jackson Kostolsky*, 21-cr-197. There, the defendant "scaled the wall to get to the Upper West Terrace," was tear-gassed, and entered the Capitol through the Parliamentarian doors soon after it was breached. He also deleted videos from his phone. These facts are not present in Mr. Lazo's case. Kostolsky was sentenced to 30 days' home detention and 36 months' probation.

Of the nine factors that the government deems to be critical in these cases, most of them are mitigating factors in Mr. Lazo's case. First, he entered the building through a side door that was propped open by another person. Second, Mr. Lazo did not encourage violence. Third, he did not encourage property destruction. Fourth, there is no evidence that he encouraged violence or destruction. Fifth, during or after the riot, his wife got rid of evidence. Sixth, Mr. Lazo was inside the building for approximately 19 minutes and he entered the Senate Gallery for less than 30 seconds. There, he did not search for documents or destroy evidence. Seventh, his posts on social media were minor and not incendiary. Eighth, he cooperated with law enforcement. And ninth, he has demonstrated remorse. As stated above, Mr. Lazo regrets going to the Capitol and lending his voice to a falsehood about a fraudulent election.

## **Conclusion**

Considering the § 3553(a) sentencing factors, a probationary sentence and restitution in the amount of $500, is a sufficient, but not greater than necessary, sentence to satisfy the purposes of sentencing.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
Ubong E. Akpan
Assistant Federal Public Defender
625 Indiana Ave., N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500